UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ZEFERINO OCAMPO FITZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | |
| ELIZABETH VENEGAS NUÑEZ, | § | |
| EXECUTOR AND HEIR OF THE ESTATE | § | |
| OF DAVID VENEGAS FRIAS, ALEJANDRO | § | Civil Action No. 3:23-CV-2298-B |
| AGUILERA ROMAN, ALEXIS VENEGAS, | § | |
| GAEL ORDAZ, EDGAR MELENDEZ, | § | |
| ASCENSION QUIROZ, AND PETER | § | |
| ANGEL, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION AND ORDER

Before the Court are Defendants Elizabeth Venegas Nuñez, Executor and Heir of the Estate of David Venegas Frias ("Nuñez"), Alejandro Aguilera Roman, Alexis Venegas, Edgar Melendez, Armando Carlos Ascencion Quiroz, and Peter Angel (collectively, "Defendants"[1])'s Motion for Summary Judgment (Doc. 54) and Plaintiff Zeferino Ocampo Fitz's Motion for Summary Judgment (Doc. 57).[2] Having reviewed the evidence, briefing, and applicable law, the Court **DENIES** Fitz's Motion and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.

---

[1] "Defendants," as referenced in this Memorandum Opinion, does not include Defendant Gael Ordaz, against whom the Clerk previously issued an entry of default that was then vacated by the Court. *See* Doc. 45, Order. Fitz has not requested re-issuance of the entry of default against Ordaz.

[2] With their Opposition to Fitz's Motion for Summary Judgement, Defendants included a Motion to strike some of the evidence relied upon by Fitz. *See* Doc. 64, Br. Opp'n Pl.'s Mot., 1–7. Because the evidence to which Defendants object would not change the outcome of the Court's ruling on the cross-motions for summary judgment, the issuance of this opinion moots Defendants' Motion to Strike.

# I.

# BACKGROUND

This lawsuit is a battle over U.S. rights to use of the trademark for the band "Los Yaguaru de Angel Venegas." The two brothers who originally performed together under the Los Yaguaru name—Angel Venegas Frias ("Angel") and David Venegas ("David")—are now deceased. Fitz, who claims that Angel's original rights to the U.S. trademark passed to him, sued Defendants for their use of the Los Yaguaru name in the United States. Nuñez, who is David's daughter and the current owner of David's U.S. trademark registration for the Los Yaguaru name, claims that Defendants rightfully use the name with her permission. Fitz asserts that David obtained the U.S. trademark registration through fraud. These competing narratives of ownership extend from the band's inception to the present.

A.    *Early History of the Los Yaguaru Band*

Around 1996, the Los Yaguaru band was formed in Mexico and shortly thereafter began to perform in the United States. *See* Doc. 55, Br. Supp. Defs.' Mot., 8; Doc. 58, Br. Supp. Pl.'s Mot., 3–4. Fitz contends that the band was formed and originally owned solely by Angel and that David's role in the band was "minor." Doc. 58, Br. Supp. Pl.'s Mot., 3, 11; Doc. 59-1, App. Pl.'s Mot., 507. Defendants assert that David co-created the band with Angel. Doc. 55, Br. Supp. Defs.' Mot., 8.

The parties agree that David left the band in the early years and then came back. Plaintiff says David left Los Yaguaru around 1998, formed his own separate musical group called "Grupo Carabo," then came back to Los Yaguaru in 2012. *See* Doc. 58, Br. Supp. Pl.'s Mot., 11. Defendants respond that David left Los Yaguaru in 2000 and primarily performed with Grupo Carabo but continued to perform with Los Yaguaru on occasion until officially rejoining in 2012. Doc. 64, Br. Opp'n Pl.'s Mot., 19.

-2-

Fitz's connection to Los Yaguaru extends back to the 1990s, when Fitz's father and Angel entered into an "agreement for exclusive professional artistic representation." Doc. 59-1, App. Pl.'s Mot., 500. The agreement indicated that Angel was the sole "director and owner" of Los Yaguaru and that he held a registered Mexican trademark and copyright for the Los Yaguaru name. *Id.* at 500–01. Fitz's father was placed in charge of promoting Los Yaguaru and was licensed to use the Los Yaguaru name—which Angel promised "[t]o not assign to any third party"—in promotion efforts. *Id.* at 502–03. Despite the restriction on assigning the trademark rights, Angel could "remove . . . at his own discretion" then-current members of the band, including David, without frustrating the purposes of the agreement. *Id.* at 500. David and Fitz both signed the agreement as witnesses. *Id.* at 505.

Fitz claims that he oversaw promotion of the band in the United States. *See id.* at 331. In that capacity, Fitz secured visas for Angel to perform in the United States and managed the group's social media platforms, which remain under Fitz's control today. *See* Doc. 58, Br. Supp. Pl.'s Mot., 6.

B. *The 2009 Assignment*

Fitz's purported ownership of U.S. rights to the "Los Yaguaru" trademark comes not through his history as manager but through two sequential written assignments, the first of which was in 2009. In that year, Angel—who was concerned for his health leading up to a major surgery, *see* Doc. 55, Br. Supp. Defs.' Mot., 8—assigned at least the registered Mexican trademark to his stepdaughter Viridiana Venegas Fabian ("Fabian"). *See* Doc. 59-1, App. Pl.'s Mot., 482–83. The parties dispute whether the 2009 assignment also assigned Angel's U.S. common law rights over the trademark to Fabian. *See* Doc. 58, Br. Supp. Pl.'s Mot., 6–7; Doc. 64, Br. Opp'n Pl.'s Mot., 10.

The translated 2009 assignment states in Recital I(b) that Angel "wishes to assign the rights he holds over the exclusive use, trademark and design of 'LOS YAGUARU DE ANGEL VENEGAS' as granted in registrations number 552594 of the Mexican Institute of Industrial Property and number 04 1996-000000000338-401 of the National Institute of Copyrights." Doc. 59-1, App. Pl.'s Mot., 482. In Clause One of the 2009 assignment, Angel assigned to Fabian "the rights he holds over the exclusive use, trademark and design of 'LOS YAGUARU DE ANGEL VENEGAS' as listed in Recital I., paragraph b) above with all that corresponds to them in fact and law." *Id.* Clause Six of the 2009 assignment states: "The conventions and clauses contained in this agreement nullify any prior verbal or written agreement. Thus this agreement reflects the conditions and terms under which the parties to this agreement wish to obligate themselves." *Id.* at 483.

Although the 2009 assignment says nothing explicitly about rights to the trademark in the United States, Fitz proffers Fabian's Declaration as proof that the transfer of rights included "any and all rights in Mexico and throughout the world." *Id.* at 969. Defendants argue that the 2009 assignment, by its written terms, transferred only the rights in the registered Mexican trademark. Doc. 64, Br. Opp'n Pl.'s Mot., 10–11, 11 n.34.

C.    *David's 2012 Trademark Application and Fabian's Opposition*

In 2012, after the 2009 assignment from Angel to Fabian, two important events were set in motion. First, when David "rejoined" the band, he and Angel entered into a joint business venture called "Los Yaguaru de Angel Venegas, S.A. de C.V." (the "Corporation"). *See* Doc. 56, App. Defs.' Mot., 7–56. The Corporation's purposes included the "realization, production, presentation, direction, organization, representation, interpretations and commercialization . . . of all manner of artistic, cultural, social and commercial activities[.]" *Id.* at 34. To that end, the Corporation's purpose

-4-

also included to "[o]btain licenses, patents, commercial names, trademarks, copyrights and in general, all real rights over industrial or intellectual property related to the business purpose." *Id.* at 36. The only two shareholders at formation were Angel and David, each holding an equal number of shares. *Id.* at 45. David was also initially designated "Sole Administrator," which gave him authority over "[g]eneral power for acts of administration" and "[g]eneral power for acts of ownership." *Id.* at 42–43, 46. Fitz asserts that the Corporation was not designed to perform any work and could not have held the rights to the Los Yaguaru mark, which Fitz contends were assigned to Fabian at the time. Doc. 61, Br. Opp'n Defs.' Mot., 2–3.

Second, soon after formation of the Corporation, David applied for registration of the Los Yaguaru trademark before the U.S. Patent and Trademark Office ("USPTO"). *See* Doc. 55, Br. Supp. Defs.' Mot., 9. In the application process, David submitted sworn statements that he was the owner of the Los Yaguaru mark, that no other person to the best of his knowledge had any right to use the Los Yaguaru Mark in commerce, and that "Angel Venegas" was his "pseudonym, stage name"—all of which Fitz in this lawsuit asserts were false statements to the USPTO. *See* Doc. 58, Br. Supp. Pl.'s Mot., 8–14.

At the time, Fabian made similar assertions of fraud in an opposition proceeding, which was assigned tracking number ESTTA50836 at the Trademark Trial and Appeal Board ("TTAB"). Doc. 56, App. Defs.' Mot., 64–67. In her opposition proceeding, Fabian claimed that David was "trying to deceive the government of the United States" by attempting to "register a mark that does not belong to him." *Id.* at 67. The mark, according to Fabian, belonged to her because she held the Mexican trademark and copyright registrations and had "used the mentioned mark all this time in Mexico and the United States." *Id.*

-5-

D.      *The 2014 Assignment*

Fitz finally enters the scene as owner of the Los Yaguaru trademark in 2014, when Fabian assigned her rights in the trademark to him. Specifically, the 2014 assignment states that Fabian had acquired from Angel via the 2009 assignment "the ownership of 100% . . . of the Reservation of Rights of Exclusive Use, the Trademark and design of 'LOS YAGUARU DE ANGEL VENEGAS' both of which are respectively registered in the National Institute of Copyrights and the Mexican Institute of Industrial Property" and that she "wishes to assign them" to Fitz. *See* Doc. 59-1, App. Pl.'s Mot., 489. In its operative clauses, the 2014 assignment referenced these two registrations and transferred them "in an unlimited manner within and outside the Mexican national territory." *Id.* at 491.

The 2014 assignment further states that Fabian had "applied for the Trademark and Design of '**LOS YAGUARU DE ANGEL VENEGAS**,' currently in process in the [USPTO] under number ESTTA508365." *Id.* at 489. But Fabian had not actually applied for registration of the trademark at the USPTO; the pending USPTO proceeding referenced in the 2014 assignment was Fabian's opposition proceeding against David's application. *See id.* at 491; Doc. 56, App. Defs.' Mot., 64–67. Nevertheless, the operative clauses of the 2014 assignment transferred the "Trademark and design application . . . in process" at USPTO. *See* Doc. 59-1, App. Pl.'s Mot., 491.

In the 2014 assignment, Fitz and Fabian also acknowledged that they were "aware of the existence of a musical group operation under the business name LOS YAGUARU DE ANGEL VENEGAS, S.A. de C.V."–*i.e.*, the Corporation formed by David and Angel in 2012. *Id.* at 489.

A few months later, in 2015, David wrote a letter to TTAB acknowledging the effect of the 2014 assignment from Fabian to Fitz as transferring ownership in the Mexican trademark rights. *See*

Doc. 59-2, App. Pl.'s Mot., 778. David's letter described Fitz as "our artistic representative in the Mexican Republic" and "our business partner." *Id.* But David asserted that this latest development was "no obstacle" for him to be granted registration of the mark in the United States. *Id.*

E.    *End of the Opposition Proceeding and Registration of the Trademark*

Shortly after the 2014 assignment, Fitz substituted into Fabian's place in the opposition proceeding. Doc. 56, App. Defs.' Mot., 82–89. The opposition proceeding continued for the next several years, with several years of suspension while the two sides litigated ownership of the Mexican trademark and copyright. *See generally* Opp. Proc. No. 91208249 (T.T.A.B.).

After David's death in 2016, Nuñez substituted into his place to defend against what had become Fitz's opposition proceeding. *See id.* at Filing No. 45 (dated June 18, 2019). Ultimately, in 2020, TTAB "issued an order to show cause based on [Fitz's] apparent loss of interest in this proceeding" and entered judgment against Fitz due to his lack of response.[3] Doc. 56, App. Defs.' Mot., 91. With the opposition proceeding dismissed, the application originally filed by David matured into Registration No. 6,150,283. *Id.* at 93–94. Nuñez, as executor of David's estate, now holds David's trademark registration. *See* Doc. 55, Br. Supp. Defs.' Mot., 11.

F.    *Facts Leading to This Lawsuit*

While David's application to register the Los Yaguaru trademark was pending, Fitz proffers evidence that David was running his band under a different name: "Angel Venegas y Su Orquesta Con Sabor." Doc. 58, Br. Supp. Pl.'s Mot., 15–16, 23–25. Defendants' use of the Orquesta Con

---

[3] Fitz explains that he failed to respond because his lawyer in that proceeding had passed away. *See* Doc. 61, Opp'n Defs.' Mot., 15.

Sabor name continued through at least 2024, and they maintain David's separate trademark in the Orquesta Con Sabor name. *See* Doc. 59-2, App. Pl.'s Mot., 1068–78.

"[O]nly recently," Fitz asserts, did he become "aware that Defendants were slowly and secretly using the LOS YAGUARU Marks instead of the ANGEL VENEGAS Y SU ORQUESTA CON SABOR Mark, to falsely convey an association" with Fitz's band. Doc. 61, Opp'n Defs.' Mot., 6. Fitz points to Defendants' use of the Los Yaguaru trademark in connection with musical shows in large American cities as causing consumers to believe that Fitz's group is actually going to perform. Doc. 58, Br. Supp. Pl.'s Mot., 16. According to Fitz, Defendants' use of the trademark in the United States has harmed his business with American venues, which refuse to hire Fitz's group to perform since Defendants' group charges less. *Id.*

      G.     *The Current Lawsuit and Motions*

Fitz filed this lawsuit on October 18, 2023, asserting causes of action for false association under the Lanham Act, Texas common law unfair competition, and cancellation of the U.S. trademark registration held by Nuñez.[4] *See* Doc. 1, Compl. Fitz now seeks summary judgment that (1) he owns the Los Yaguaru trademark, (2) Defendants infringe Fitz's trademark, and (3) the trademark registration held by Nuñez is invalid because David originally obtained it through fraud. Doc. 57, Pl.'s Mot.

Defendants' Motion seeks summary judgment that (1) Fitz's Lanham Act and common-law claims are barred by applicable limitations periods and laches, (2) Fitz cannot prove an essential element of the Lanham Act and common-law claims because he lacks ownership in U.S. rights to

---

[4] In its previous ruling on Defendants' Motion to Dismiss, the Court dismissed Fitz's claims for Texas common law trademark infringement and accounting. Doc. 46, Mem. Op. The Court also construed Fitz's first two counts as one claim for false association under the Lanham Act. *See id.* at 4 n.2.

the Los Yaguaru trademark, (3) there are no facts to establish liability for contributory infringement on the part of Defendants besides Nuñez, (4) Fitz cannot show that David intended to deceive the USPTO, and (5), in the alternative, Fitz and Nuñez are co-owners of U.S. rights to the Los Yaguaru trademark. Doc. 54, Defs.' Mot.

## II.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). In determining whether a genuine dispute exists, the Court views the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000).

## III.

## ANALYSIS

Having examined the record evidence proffered by Fitz and Defendants, the Court finds no genuine dispute exists on Defendants' second summary judgment issue: that Fitz cannot prove an essential element of his Lanham Act and Texas common law claims. Viewing the evidence in the light most favorable to Fitz, no reasonable jury could conclude that he possesses rights to the Los Yaguaru mark that would support the false association and unfair competition counts. Besides the two written assignments in 2009 and 2014, Fitz advances no other legal theory under which he possesses U.S. rights to the Los Yaguaru trademark prior to David's application for the successfully registered trademark, which is an essential element of the false association and Texas common law

unfair competition claims. As those claims must be dismissed, the Court lacks subject-matter jurisdiction over the only remaining claim for cancellation and therefore dismisses it as well.

> A.    *Angel's common law rights in the Los Yaguaru trademark did not pass to Fitz.*

"A trademark is 'any word, name, symbol, or device, or any combination thereof . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'" *Dall. Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 632 (N.D. Tex. 2009) (Kinkeade, J.) (quoting 15 U.S.C. § 1127). Trademarks can be registered with the USPTO but need not be registered for rights to the trademark to exist at common law. *See id.* at 633. Moreover, trademarks adhere to the "territoriality doctrine," which is the concept that foreign rights to use a certain trademark are distinct from domestic rights to the same trademark. *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985); *Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1568–69 (Fed. Cir. 1990); J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition (hereinafter, "McCarthy") § 29:1 (5th ed. 2022).

"[T]o transfer ownership of a trademark under common law, an assignment is . . . necessary." *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 618 (5th Cir. 2023) (citing *Diebold, Inc. v. Multra-Guard, Inc.*, 189 U.S.P.Q. 119, 1975 WL 20913, at *6 (T.T.A.B. Oct. 2, 1975), and 2 McCarthy § 18:4). Although a registered trademark must be assigned in writing, assignment of a common law trademark need not be in writing but nevertheless must be established by "strong evidence . . . to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentives to identify expressly the ownership of the marks they employ." *Id.* (quoting *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997)).

-10-

"In many situations, the issue of whether a transaction constitutes a transfer of trademark rights will be determined by applying the usual rules of contract law." 3 MCCARTHY § 18:4. This Court "looks 'to the language of the contract, unless ambiguous, to determine the intention of the parties.'" *United States v. Long*, 722 F.3d 257, 262 (5th Cir. 2013) (quoting *In re Conte*, 206 F.3d 536, 538 (5th Cir. 2000)). The Court does not look beyond the four-corners of an unambiguous contract or examine parol evidence when the meaning of a written contract is clear. *See id.*

When a trademark is assigned, the business that the trademark represents must go with it because "assignment of a trademark without the goodwill it represents is invalid." *See C.P. Ints., Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 701 (5th Cir. 2001) (citation omitted); 3 MCCARTHY § 18:2. This rule prohibiting an "assignment in gross" results from the fact that a "trademark is merely a symbol of goodwill and has no independent significance apart from the goodwill that it symbolizes." *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999) (citations omitted). Although an assignor can continue to use the assigned trademark under license from the assignee, the assignor must "have divested his rights in order for there to be a valid assignment." *Emerald City Mgmt., LLC v. Kahn*, No. 4:14-cv-358, 2016 WL 98751, at *6 (E.D. Tex. Jan. 8, 2016) (citations omitted). Thus, "a person who has adopted and used his surname as a trademark . . . may transfer the same with the good will of a business and thereby divest himself of the right to use his name in connection with such a business." *King Pharr Canning Operations v. Pharr Canning Co.*, 85 F. Supp. 150, 156 (W.D. Ark. 1949) (quoting *Guth v. Guth Chocolate Co.*, 224 F. 932, 933 (4th Cir. 1915)). To fail to fully divest would be to "keep for himself the essential thing that he has sold." *Id.*

Fitz points to a distinct chain of title to argue that he owns U.S. rights to the Los Yaguaru trademark: (1) Angel's use of the mark in U.S. commerce since 1997, (2) Angel's 2009 assignment

to Fabian, and (3) Fabian's 2014 assignment to Fitz. *See* Doc. 58, Br. Supp. Pl.'s Br., 20. The parties do not dispute Angel's early use of the Los Yaguaru name or that such use established Angel's common law rights in the trademark. Therefore, whether Fitz inherited Angel's rights to the Los Yaguaru trademark depends on the terms of the 2009 and 2014 assignments. Fitz's reading of the two written assignments—that they "transferred all rights in the LOS YAGUARU Marks with unlimited scope both within and outside of Mexico," Doc. 61, Opp'n Defs.' Mot., 20—is unsupported by the text of the agreements.

Start with the 2009 assignment: Its plain text reflects transfer of only the Mexican intellectual property registrations. The relevant operative clause in the 2009 assignment states that Angel assigns "the rights he holds over the exclusive use, trademark and design of 'LOS YAGUARU DE ANGEL VENEGAS' as listed in Recital I., paragraph b) above with all that corresponds to them in fact and law." Doc. 59-1, App. Pl.'s Mot., 482. Recital I(b) references the same rights "as granted in" the Mexican trademark and copyright registrations. *Id.* In assigning the rights "as listed in" the Recitals, which reference the rights "as granted in" specifically enumerated registrations, the 2009 assignment cannot be understood by its plain text to have assigned any more than what was enumerated therein.

For two reasons, the Court cannot reform the unambiguous meaning of the 2009 assignment through Fabian's declaration submitted by Fitz. First, under standard rules of contract interpretation, Fabian's testimony introduces new words—"throughout the world"—that are beyond the 2009 assignment's four corners and cannot be considered as a matter of law. *See* Doc. 59-2, App. Pl.'s Mot., 970; *Long*, 722 F.3d at 262. The 2009 assignment itself directs the exclusion of Fabian's testimony, as it nullifies prior verbal agreements and states that it "reflects the conditions and terms under which the parties . . . wish to obligate themselves. *See* Doc. 59-2, App. Pl.'s Mot., 483.

Second, under the rules governing trademark assignments, the 2009 assignment and Fabian's testimony could not, to any reasonable jury, constitute the "strong evidence" necessary under *Rex Real Estate* to establish assignment of U.S. common law rights. *See* 80 F.4th at 618. The text of the 2009 assignment does not expressly identify the U.S. common law rights, and Fabian's testimony to reform the written agreement is the "self-serving testimony" about which the Fifth Circuit has warned. *See id.* To be clear, Fitz does not argue, and Fabian does not testify, that the U.S. common law rights were orally assigned—which would be allowed if it had occurred. *See id.* Instead, Fabian's declaration references the written assignment and attempts to interpret it contrary to its plain language. *See* Doc. 59-2, App. Pl.'s Mot., 969. Such interpretation could not overcome the evidentiary strength of the written assignment.

Moreover, the evidence submitted by Fitz cuts against his interpretation of what the 2009 assignment did. If Angel truly assigned U.S. common law rights in the trademark to Fabian via the 2009 assignment, then Angel was no longer the owner of any goodwill associated with his musical group. Yet, there is no evidence in the record that Fabian did anything to prevent Angel from forming the Corporation with David in 2012, despite her awareness of its existence. *See* Doc. 59-1, App. Pl.'s Mot., 489. And Fitz presents evidence that, in 2012, Angel remained the owner of the band. *See* Doc. 58, Br. Supp. Pl.'s Mot., 11–12, 20–21 (citing Ascencion Quiroz deposition). If Angel remained the owner and had not fully divested his rights to the Los Yaguaru name, the purported assignment of U.S. trademark rights would be invalid as an assignment in gross. *See C.P. Ints.*, 238 F.3d at 701. Those facts, though not decisive on their own, suggest that Fitz's understanding of the 2009 assignment is incorrect. In any event, Fitz cannot meet the "strong evidence" threshold for

establishing that the 2009 assignment transferred U.S. common law trademark rights from Angel to Fabian.

Because the 2009 assignment did not transfer U.S. common law rights from Angel to Fabian, Fabian could not have transferred them to Fitz through the 2014 assignment. Had Fabian held the rights to the U.S. trademark, conflicting statements in the 2014 assignment would render it ambiguous. For instance, the 2014 assignment lists and assigns specifically the Mexican trademark and copyright registration but says in its operative clauses that the assignment is "unlimited," "within and outside the Mexican national territory." Doc. 59-1, App. Pl.'s Mot., 489, 491. Further confounding is the 2014 assignment's reference to a U.S. trademark application that did not exist. *Id.* But the Court need not resolve these ambiguities because, as Fabian did not receive U.S. common law rights through the 2009 assignment, she could not have assigned them to Fitz in 2014.[5]

Besides the written assignments, Fitz points to the "operational reality of the brand"—the facts that he "currently controls and operates the group's official digital channels," that these channels "collectively reach an audience of over three million followers," and that three original Los Yaguaru band members perform with Fitz's group—as evidence of his "superior legal and commercial claim" to the Los Yaguaru trademark. Doc. 58, Br. Supp. Pl.'s Mot., 21. These facts, which are consistent with the undisputed fact that Fitz owns the Mexican trademark and rights to operate the group in Mexico, do not raise a material dispute as to the operation of the assignments even if taken in the light most favorable to Fitz. Fitz's claims depend on him having inherited U.S. common law rights through a chain of assignments starting with Angel. Having examined those assignments for

---

[5] Fitz suggests that David's 2015 letter to TTAB constituted an admission that the 2014 assignment made Fitz the owner of the Los Yaguaru mark and band. *See* Doc. 58, Br. Supp. Pl.'s Mot., 7–8. To the extent that David's characterization in the 2015 letter is relevant, the document itself (Doc. 59-2, App. Pl.'s Mot., 778) is consistent with the fact that Fitz held Mexican rights to the trademark but not U.S. rights.

themselves, the Court finds no material dispute that the relevant evidence could not convince a reasonable jury that Angel's original U.S. common law rights were transferred to Fitz.

> **B.**    *The fact that Fitz is not the owner of U.S. common law rights dooms his Lanham Act and Texas common law unfair competition claims.*

As this Court explained in ruling on Defendants' previous motion to dismiss, Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), creates the cause of action for false association, which is also often called false designation of origin. *See* Doc. 46, Mem. Op., 4 n.2. The statute provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).

False association is somewhat of an "umbrella" cause of action permitting different theories of liability. *See Belmora L.L.C. v. Bayer Consumer Care AG*, 819 F.3d 697, 709–10 (4th Cir. 2016) (explaining that Section 43(a) "goes beyond trademark protection" and can guard against unfair use of a mark that has become generic or against unfair use of a mark never used in commerce (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003))).

Most commonly, the false association cause of action is used to "protect[] unregistered trademarks." *See Rex Real Est.*, 80 F.4th at 616–17. When the statute is so used, a plaintiff "must show (1) it possesses a legally protectible trademark and (2) [d]efendant's use of this trademark 'creates a likelihood of confusion as to source, affiliation, or sponsorship.'" *Id.* at 616 (quoting

*Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017)). On the first prong, the plaintiff must be either the owner or a licensed user of the trademark. *See, e.g., Red River Bancshares, Inc. v. Red River Emps. Fed. Credit Union*, No. CV 17-1370, 2019 WL 4727857, at *5 (W.D. La. Sept. 26, 2019) (explaining that both owner and exclusive licensee have established first element, labeled "ownership"). An unfair competition claim under Texas common law "presents essentially no difference in issues" from false association trademark infringement, and therefore "[t]he analysis with respect to [plaintiff's] claims under the Lanham Act will be dispositive of its corresponding claims under Texas law as well." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010) (internal quotation mark and citations omitted).

In an unregistered trademark holder's infringement claim against the registrant of a trademark, the registrant is "granted a presumption of ownership, dating to the filing date of the application for federal registration." *Dall. Cowboys*, 616 F. Supp. 2d at 633 (citation omitted). Thus, in such a case, the unregistered trademark holder must establish possession and that its use was prior to the date the registrant filed his application. *See id.* at 632–33; *see also* 2 MCCARTHY § 16:17.

Under another theory of liability, false association does not require a plaintiff to establish an ownership interest in a U.S. trademark. *See Rex Real Est.*, 80 F.4th at 617 (citing *Belmora*, 819 F.3d at 706). In *Belmora*, for example, the plaintiff owned a Mexican trademark registration for a painkiller called "Flanax," which was popular in Mexico, but the plaintiff had "never marketed or sold its FLANAX in the United States." *See* 819 F.3d at 702. The defendant, which owned U.S. rights to the Flanax trademark, had begun using packaging that was confusingly similar to the Mexican brand and had begun making statements implying that its product was the same as the one sold in Mexico. *Id.* at 702–04. The plaintiff alleged that the defendant's actions in the United States were harming

the plaintiff's business in Mexico because consumers who regularly traveled between the two countries would forgo purchasing the plaintiff's product after they had already purchased the defendant's product. *Id.* at 711. As a result, the plaintiff could state a false association claim. *See id.* at 713.

*Belmora* explains how the foreign owner of a trademark and the domestic owner of the same trademark can legally coexist, so long as the business of one in one country does not cause injury to the business of the other in the other country. *See id.*; *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 1075 (Fed. Cir. 2022) ("*Belmora* suggests that . . . commercial injury to a company's sales in a foreign country qualifies as damage for purposes of § 14(3) and § 43(a)" of the Lanham Act.); *see also* 4 MCCARTHY § 29:7 (listing examples where "the same mark identifies two different sources in two different nations"). Thus, when relying on foreign trademark rights for a false association claim, a plaintiff must show that the defendant's misleading association injures plaintiff's business in its own country. *See Belmora*, 819 F.3d at 710 n.8.

The parties do not dispute that Fitz owns Mexican rights to the Los Yaguaru trademark, which would allow him to support a *Belmora*-style false association claim if Fitz alleged or provided any evidence of injury to his business in Mexico. But Fitz focuses entirely on injury in the United States in his complaint, *see* Doc. 1, Compl., ¶¶ 25–27, 44; only presents evidence of how Defendants' purported infringement in the United States has harmed Fitz's interests in the United States, *see* Doc. 58, Br. Supp. Pl.'s Mot., 16–17; and specifically disclaims any "rel[iance] on foreign rights as the basis for his claim of priority," *see* Doc. 61, Br. Opp'n Defs.' Mot., 21. Fitz's false association claim therefore fits under the rubric of a typical trademark infringement claim, not a *Belmora*-style false association claim, and thus rises and falls with whether he can establish that he

-17-

possesses U.S. common law trademark rights in use prior to the date of David's application in 2012 that matured into a registered trademark.

Fitz's argument that he possesses priority rights depends on the purported transfer of prior U.S. common law rights from Angel to Fabian to Fitz through the 2009 and 2014 assignments. Because there is no genuine dispute that those two assignments did not transfer U.S. common law rights to Fitz, he cannot prove an essential element of his Section 43(a) claim. *See Rex Real Est.*, 80 F.4th at 616. Likewise, he cannot prove his Texas common law unfair competition claim, which presents the same issues. *See Amazing Spaces*, 608 F.3d at 235 n.7. Therefore, Counts I, II, and IV, which assert those causes of action, must be dismissed.

       C.     *Fitz's cancellation claim is remedial, and the Court lacks jurisdiction over it on its own.*

"In any action involving a registered mark the court may . . . order the cancelation of registrations . . . with respect to any party to the action." 15 U.S.C. § 1119. The statute "provides cancellation only as relief to a party who has proved infringement because § 1119 is 'remedial, not jurisdictional.'" *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1037 (9th Cir. 2023) (quoting *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 598 (9th Cir. 2014)); *see also Dall. Cowboys*, 616 F. Supp. 2d at 644 (considering trademark cancellation as remedy only after finding Lanham Act violations).

Even if a lawsuit is "properly instituted" with claims besides cancellation granting the court jurisdiction at first, a court cannot retain subject-matter jurisdiction over the cancellation claim alone once the other claims are dismissed. *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 99 (2d Cir. 2011). "If a court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED R. CIV. P. 12(h)(3); *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S.

694, 702 (1982) (explaining that federal courts must dismiss on their own motion where they lack Article III jurisdiction).

The Court is aware of one federal court decision holding that jurisdiction over a cancellation claim continues to exist after summary judgment has been granted dismissing all other claims: *Gerlach, Inc. v. Gerlach Maschinenbau GmbH*, 619 F. Supp. 3d 811, 812–15 (N.D. Ohio 2022). The court in *Gerlach* based its conclusion on the principle that "jurisdiction is determined at the outset of the case." *Id.* at 814. This Court does not find *Gerlach* persuasive because it failed to adhere to the rule that the "case-or-controversy requirement subsists through all stages of federal judicial proceedings.'" *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted); *Nike*, 663 F.3d at 99 (applying rule to dismiss lone cancellation claim after dismissal of other claims).

As Fitz's other claims giving him a jurisdictional hook cannot be proven and must be dismissed, the Court does not have jurisdiction under 15 U.S.C. § 1119 to grant the remedy of cancellation. The cancellation claim therefore must also be dismissed.

In so doing, the Court expresses no opinion as to Fitz's arguments that David obtained the Los Yaguaru trademark registration through fraud or that David lacked ownership of the trademark at the time he applied for registration. If Fitz desires, he may continue to pursue cancellation to the extent allowed before TTAB, which has authority to consider cancellation petitions without a live case or controversy as required in federal court. *See* 4 MCCARTHY § 30:110.

## IV.

## CONCLUSION

For the foregoing reasons, Defendants' Motion (Doc. 54) is **GRANTED** insofar as there is no genuine dispute that Fitz cannot prove an essential element of his claims for false association

under the Lanham Act and Texas common law unfair competition, which are **DISMISSED WITH PREJUDICE**. Fitz's Motion (Doc. 57) is **DENIED**. The remainder of Defendants' Motion and all other pending motions are **DENIED AS MOOT**. Fitz's only remaining claim—cancellation under 15 U.S.C. § 1119—is **DISMISSED** for lack of subject-matter jurisdiction.

    SO ORDERED.

    SIGNED: October 8, 2025.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE